**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MARCOS MORALES,                              CASE NO. 2:07-CV-1274
                                             JUDGE GRAHAM
            Petitioner,                      MAGISTRATE JUDGE KING

v.

WARDEN, NOBLE CORRECTIONAL
       INSTITUTION,

            Respondent.

<u>REPORT AND RECOMMENDATION</u>

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus

pursuant to 28 U.S.C. 2254. This matter is before the Court on the instant petition, Doc. No.

4, respondent's motion to dismiss, Doc. No. 10, and the exhibits of the parties. For the

reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**

 as barred by the one-year statute of limitations under 28 U.S.C. §2244(d).

**PROCEDURAL HISTORY**

The Ohio Fifth District Court of Appeals summarized the facts and procedural

history of this case as follows:

> On April 5, 2004, the Licking County Grand Jury indicted
> appellant on one count of aggravated possession of drugs
> (methamphetamine) in violation R.C. 2925.11(A)(C)(1)(e), a
> felony of the first degree. The indictment alleged that appellant
> knowingly obtained, used or possessed methamphetamine in
> an amount equal to or exceeding one hundred times the bulk
> amount. At his arraignment on April 19, 2004, appellant
> entered a plea of not guilty to the charge.

Subsequently, a jury trial commenced on July 16, 2004. The following evidence was adduced at trial.

At approximately 5:30 p.m. on March 25, 2004, Deputy Sheriff Greg Spung of the Licking County Sheriff's Department was sitting stationary in his marked cruiser on State Route 79 during his shift when he observed a Toyota Camry traveling 45 miles per hour in a posted 35 mile per hour speed zone. The deputy stopped the vehicle and ordered both occupants out of the same. After the two men in the vehicle were secured in other cruisers, Deputy Spung impounded and inventoried the vehicle.

At trial, Deputy Spung testified that appellant was driving the vehicle, which had an Arizona temporary tag. Alonso Garcia Ortiz was appellant's passenger. According to the deputy, appellant's driver's license listed an address in Phoenix, Arizona. Deputy Sheriff Spung cited appellant for speeding.

On cross-examination, Deputy Sheriff Spung testified that, on the date in question, he was working in coordination with the Central Ohio Drug Enforcement Task Force and that, at its direction, he executed a traffic stop on appellant. The following is an excerpt from Deputy Sheriff Spung's trial testimony:

"Q. Okay. And were you given a description of a vehicle that ultimately matched the one that Mr. Morales was driving?

"A. Actually, the description that was given to us wasn't even the right description.

"Q. Okay. Now, ultimately, without getting into exactly what was said to you, was the gist of the instructions that were given to you basically if you see a vehicle matching this description with these types of occupants, you're to execute this traffic stop?

2

"A. We were-I was to establish the reason for the stop first.

"Q. Okay. When you say establish the reason for the stop, would that be determining that, in fact, Mr. Morales was speeding?

"A. That could be-that was in the this case, yes, some type of violation, yes.

"Q. So basically they were just looking for an excuse to pull Mr. Morales over; is that correct?

"A. I don't know why they were wanting to stop the vehicle-wanting a reason to stop it." Transcript at 64-65.

The next witness to testify at trial was Mark Emde, a K-9 officer with the Heath Police Department. Officer Emde testified that, on March 25, 2004, he was asked to conduct a drug sweep on appellant's vehicle using Bella, his K-9 dog. Officer Emde testified that, during the sweep of appellant's vehicle, Bella alerted to drugs in the inside console of the same. The officer then informed Detectives Romano and Cortright about the positive signal from Bella.

Detective George Romano, who works for the City of Newark and is also assigned to the Central Ohio Drug Enforcement Task Force, testified that Detective Cortright, who is a field supervisor for the task force, received information that either a blue Ford Ranger or a green Toyota with two Hispanic males was "possibly in route to the Newark area with transport of methamphetamine in a large quantity." Transcript at 80. The vehicle, which was described as having Arizona or Indiana plates, was anticipated to arrive in approximately one hour. Based on the information, both marked and unmarked units from the task force, the Licking County Sheriff's Department and the Heath Police Department were aligned along State Route 70 and State Route 79 in an attempt to locate the vehicle.

3

Detective Romano testified that, while he was on State Route 79, a beige vehicle with Arizona tags passed by containing two Hispanic males. Deputy Sheriff Spung was then told to "effect a probable cause stop, to find a reason, to see if there was actual reason given to him to make a stop." Transcript at 82. Detective Romano testified that, after the stop, appellant was arrested because his driver's license was under suspension. After Bella alerted to drugs, Detectives Romano and Cortright began searching the vehicle in order to conduct an inventory and also to search for drugs. Detective Romano testified that when he looked inside the center arm rest console, he observed four plastic baggies containing a white powdery substance. Further search of the vehicle yielded one large baggie containing white powder near the gearshift knob. The following is an excerpt from Detective Romano's trial testimony:

"Q. You're not talking about the actual knob itself; you're talking about the base of the shifting lever?

"A. Correct, sir, the trim, if you will, around it.

"Q. Okay. You said that you looked at it, and did you notice something about it?

"A. I did, sir. Obviously it's right in my face. I work with vehicles quite often. Vehicles are put together in a nice, clean manner. This particular console, that cover was raised up, I don't know, maybe a quarter of an inch, if that high. It was not fitting like it should be. With that being out of the ordinary, I popped that up...." Transcript at 91-92. The detective requested that fingerprint analysis be conducted on the baggies.

Detective Romano further testified that there were no clothes or luggage in the vehicle and that he was "struck by the lack of contents in the vehicle" since someone traveling from Arizona to Ohio would most likely have some type of luggage.

4

Transcript at 98. When asked, the detective testified that the current street value of methamphetamine is $100.00 a gram and that approximately $35,000.00 worth of methamphetamines were found.

Detective Romano, when questioned on cross-examination about who Detective Cortright received the information about the vehicle containing two Hispanic males from, testified that, due to an on-going investigation, he was unable to reveal the name of such individual. After a brief side bar discussion, Detective Romano, however, did testify that such information came from an individual who had been arrested based on a narcotics investigation in another city.

The next witness to testify at trial was Timothy Elliget, a criminalist with the City of Newark who is an expert in the area of drug testing identification and fingerprint analysis. Elliget testified that each of the baggies found in the vehicle was weighed individually and then a combined weight was determined and that the baggies were rebagged into 13 baggies. According to Elliget:

"In State's Exhibit 5, there were two separate plastic baggies which contained-one contained four and the other one contained five bags, so they've been indicated as two, which was the item number given by our property room clerk for identification. So A-1 was 27.5 grams. A-2 was 27.80 grams. 2-A-3 was 27.78 grams. 2-A-4 was 27.50 grams. 2-B-1 is 27.84 grams. 2-B-2 is 27.48 grams. 2-B-3 is 27.82 grams. 2-B-4 is 27 grams even. 2-B-5 is 27.52 grams." Transcript at 123. Elliget further testified that, in addition to the above nine bags, bag 1-A contained 27.79 grams, bag 1-B contained 27.58 grams, bag 1-C contained 27.88 grams, and bag 1-D contained 27.66 grams. Elliget testified that testing on all thirteen baggies led him to conclude that the contents were methamphetamines.

On cross-examination, Elliget was questioned about testing that he had performed on a partial palm print found on one of the baggies. Elliget testified that he conducted comparisons

5

between such print and known samples from appellant and Ortiz, his passenger, and that the partial print did not match either appellant or Ortiz.[FN1]

FN1. Elliget testified that he was never supplied with a sample of a palm print by Ortiz, but used a known sample for comparison.

Appellant testified at trial in his own defense. Appellant testified that he lives in Indianapolis with his wife and that, during early March of 2004, he traveled from Indianapolis to Arizona with his wife and her daughter to visit family. Appellant testified that after his Chevrolet Lumina car broke down in Arizona, he borrowed his sister's 1999 "brownish, beige" Toyota Camry to return to Indianapolis. Transcript at 140. According to appellant, Alonso Garcia Ortiz, his passenger at the time of the incident in this case, normally drove a 1995 blue Ford truck.

Appellant further testified that two weeks before he came to Ohio, the keys to the Toyota Camry disappeared and that he found them a week before leaving for Ohio. When asked why he traveled to Ohio and why Mr. Ortiz had joined him, appellant testified that he had money problems and was coming to Ohio to borrow money from someone Ortiz had introduced him to. Appellant testified that he insisted that Ortiz join him on his trip to Ohio because Ortiz knew his way around and had been to Licking County before whereas appellant had not. While Ortiz did not want to come with appellant, he finally relented, although appellant testified that Ortiz did not want to talk during the trip and asked appellant to turn off the radio.

Appellant admitted that he was speeding when he got off State Route 70 and onto State Route 79, although he testified that he was not going "as fast as they're saying I did." Transcript at 146. Appellant denied that the drugs found in the car that he was driving were his and testified that he was unaware that the drugs were in the vehicle.

At trial, appellant further testified that the person who he was coming to Ohio to borrow money from was named Ricardo and that Ricardo had been mad at appellant in the past and did not like him. Appellant indicated that he thought of Ricardo when he was stopped by the police, but testified that he never gave this information to the police.

At the conclusion of the evidence and the end of deliberations, the jury, on July 16, 2004, found appellant guilty of aggravated possession of drugs (methamphetamine). The jury further found that the amount of methamphetamine involved "did equal or exceed 100 times the bulk amount of Methamphetamine; to wit, more than 300 grams of Methamphetamine." As memorialized in a Judgment Entry filed on July 27, 2004, appellant was sentenced to ten years in prison.

*State v. Morales*, 2006 WL 2175144 (Ohio App. 5th Dist. September 9, 2005). Petitioner filed a timely appeal in which he asserted the following assignments of error:

I. THE DEFENDANT'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE STATE'S FAILURE TO PROVIDE EVIDENCE TO THE APPELLANT IN DISCOVERY.

II. THE CONVICTION OF THE APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

III. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY UPON BULK AMOUNT OF, AND THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

IV. THE TRIAL COURT ERRED IN SENTENCING THE APPELLANT TO TEN YEARS MINIMUM MANDATORY TIME.

7

V.    THE    DEFENDANT    WAS    DENIED    EFFECTIVE
ASSISTANCE OF COUNSEL.

*See id.*    On September 9, 2005, the appellate court affirmed the trial court's judgment.  *Id.*

On February 8, 2006, the Ohio Supreme Court dismissed petitioner's subsequent appeal.

*State v. Morales*, 108 Ohio St.3d 1438 (2006).

On January 31, 2008, petitioner filed the instant *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. §2254.  He alleges that he is in the custody of the respondent

in violation of the Constitution of the United States based upon the following grounds:

> 1.  All grounds raised in the state courts.
>
> Pursuant to section four of the AEDPA, 28 U.S.C. §2254(d)(2), the state court's decisions resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at trial.
>
> 2.  All grounds raised in the state courts.
>
> Pursuant to section four of the AEDPA, 28 U.S.C. §2254(d)(1), the state court's decisions resulted in a decision that was contrary to or involved an unreasonable application of law as determined by the U.S. Supreme Court.

It is the position of the respondent that this action is time-barred.

## II.  STATUTE OF LIMITATIONS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a

one-year statute of limitations on the filing of habeas corpus petitions.  28 U.S.C. §2244(d)

provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Petitioner's conviction became final on May 9, 2006, *i.e.,* ninety days after the Ohio Supreme Court's dismissal of petitioner's appeal on February 8, 2006, when the time for filing a petition for a writ of *certiorari* to the United States Supreme Court expired.  The statute of limitations expired one year later, on May 9, 2007.  Petitioner did not file the

9

instant petition until January 31, 2008, more than eight months after that date.

However, under the "mailbox rule" of *Houston v. Lack*, 487 U.S. 266, 270-71 (1988), a *pro se* prisoner's filings are deemed filed under federal law on the date of delivery to prison officials for mailing, and petitioner indicates that he executed and submitted his petition to prison officials for mailing on September 6, 2006, long before the statute of limitations expired.  *See Petition*, at 13.   In response, respondent has submitted the *Declaration of Daniel Bachmann*, Account Clerk Supervisor at the Noble Correctional Institution, where petitioner is incarcerated, stating that, according to prison records, petitioner did not request postage or submit his petition to prison officials for mailing until December 14, 2007, after the statute of limitations had expired.  *Exhibit 21* to *Motion to Dismiss*, ¶3.   Respondent has also attached a copy of petitioner's December 14, 2007, withdrawal slip for postage.  *See Exhibit* attached to *Declaration of Daniel Bachmann*.  The *Declaration of Daniel Bachmann* specifically states in relevant part:

> Based on our computer records, I have determined that the cash withdrawal in December of 2007... is the only record the institution has of a cash withdrawal by inmate Morales for postage.
>
> The procedure for mailing an item with postage obtained from an inmate's account is as follows: The inmate fills out the withdrawal slip, noting the date in the upper right hand corner.  Then, it is signed by the housing unit staff.  The housing unit forwards the slip attached to the envelope to the mail room where postage is assessed.  The envelope and withdrawal slip are then forwarded to the cashier's office where the postage is deducted from the inmate's account.  The processing date is indicated on the bottom right.  At that point,

> the envelope and slip are returned to the mailroom for mailing
> to the addressee.  The inmate receives a copy of the completed
> slip.

*Declaration of Daniel Bachmann*, ¶¶ 3,4, *Exhibit 21 to Motion to Dismiss.*  Petitioner has not

responded to the *Motion to Dismiss,* nor has he controverted the statements made in the

*Declaration of Daniel Bachmann.*  Under these circumstances, petitioner's allegation that he

submitted his habeas corpus petition to prison officials for mailing on September 6, 2006,

and approximately one year and four months before it was received by the Clerk of this

Court, is not worthy of credit.

Petitioner also contends that equitable tolling of the statute of limitations is

appropriate.  However, petitioner bears the burden of establishing that he has been diligent

in pursuing his rights and that extraordinary circumstances prevented him from filing his

petition in a timely fashion.  *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005), citing *Irwin*

*v. Department of Veterans Affairs,* 498 U.S. 89, 96 (1990).  Nonetheless, petitioner does not

indicate, and this Court is unable to discern from the record, any extraordinary

circumstances that would justify equitable tolling of the statute of limitations for the time

period at issue here.  *See Dunlap v. United States*, 250 F.3d 1001, 1008 (6th Cir. 2001).

For all the foregoing reasons, the Magistrate Judge concludes that petitioner's habeas

corpus petition is untimely and therefore **RECOMMENDS** that this action be **DISMISSED**

as barred by the one-year statute of limitations imposed under 28 U.S.C. §2244(d).

If any party objects to this *Report and Recommendation,* that party may, within ten (10)

days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

September 19, 2008                                      s/Norah McCann King
                                                        Norah McCann King
                                                        United States Magistrate Judge

12